The first case today is United States v. Wieck, 19-6075, and we are ready when you are, counsel. Good morning, your honors, and it's Kevin Wieck. May it please the court, my name is Josh Lee, for Mr. Wieck, from the Federal Public Defender's Office. Mr. Wieck has raised three issues in this case, but I thought I would start with what might be the less familiar of the issues, and that's the relocation enhancement. That enhancement shouldn't have been applied here, because contrary to what the district court ruled, the fraudulent scheme alleged here was not relocated from Oklahoma to Mexico. In this court's decision in Paredes, the court sharply distinguished between a relocation of the defendant himself and a relocation of the fraudulent scheme, and here Mr. Wieck relocated only himself to Mexico and not the scheme. Do we have to defer to the district court's finding of what the scheme was? No, I don't think… The district court essentially said that the scheme was to receive the payments, and that after he moved to Mexico, he was receiving the payments and not giving the payments to the investors. Do we have to defer to that? I don't think that you do, because none of the actual facts are disputed. So nobody disputes what he did in Oklahoma versus what he did in Mexico, and the only question is whether, as a matter of law, that adds up to a relocation of the scheme. And what happened in Mexico, let's think about what happened in Mexico. He brought the oil proceeds there, and he spent them. Now, that's not a scheme to defraud. First of all, it's certainly not the scheme to defraud that was charged in this case and convicted in this case. Well, why isn't it? I mean, to get the proceeds of the oil and spend them rather than giving them back to the investors is the effectuation of the fraud itself. That's exactly what the fraud is. So, first of all, the scheme to defraud that was charged and convicted was investment solicitation fraud. Well, that had already been completed. To me, the first part of this fraud was getting the money. That was completed. There was no more to be done there, whether he stayed in Oklahoma or whether he went to Mexico. So, the only remaining part of the fraud was concealment and taking the receipts and not giving them back. And it seems to me that that is the conduct we have to ask was relocated or not relocated, because there was nothing else on the scheme to be done at that point. So, first of all, the Ninth Circuit in Petroff, in a case that I cited in my brief, says that what has to be relocated is the underlying offense, not some ancillary scheme to cover it up. So, if the underlying offense was already completed, then it can't have been relocated. Let me try to ask you again then. What conduct do you believe would have occurred on the underlying offense in Oklahoma rather than in Mexico if he had not done that relocation? What conduct would have occurred in Oklahoma rather than in Mexico? On this fraud, during the time it was relocated, that would have happened in Oklahoma but for the relocation? He would have kept the money there and spent it in Oklahoma. Okay. And instead, he kept the money in Mexico and spent it there. So, why isn't everything that was going to be done by the fraud during that segment of the fraud moved to Mexico? So, what's going on in Oklahoma while he is in Mexico? The oil is being pumped in Oklahoma. The company that's purchasing the oil is purchasing it in Oklahoma. The company in Oklahoma is sending it to an Oklahoma bank account. So, the money is actually being taken in Oklahoma. And this is dramatically illustrated by the fact that when Mr. Wick is in Mexico, he has to physically send people into Oklahoma both to take care of paperwork related to the oil wells and to physically withdraw cash from an Oklahoma bank account. How many times did he do that? I'm unclear on the record on that. How many times did cash come into Mexico and how many times did he send instructions out? My recollection is that there was a plan to do it a number of times, but that it only happened once. That was in October when she went up there and brought down money to him and then maybe it was twice. But there was a plan to bring money a number of different times, but my recollection is it only happened once. Then there's also during the scheme as it existed after the underlying solicitation fraud, there's also the fact that part of the alleged scheme was not filing these documents that should have been filed in Oklahoma. So, the omissions didn't occur in Mexico. They occurred in Oklahoma because that's where all of the paperwork was supposed to be filed. But, again, I think that what a scheme to defraud is, and this is looking from this court's jury instructions, is taking property through deception. The taking occurred in Oklahoma both at the beginning of the fraud and at the end of the fraud because the money is being sent to his bank accounts in Oklahoma. The deception also occurred only in Oklahoma because that's where he made the false representations to the investors that they were going to get these proceeds. So, not only is what happened in Mexico not the scheme to defraud that was charged, which is what's required, it wasn't a scheme to defraud at all because both the deception and the taking occurred in Oklahoma. Now, I think it's useful to compare this case to what the Sentencing Commission had in mind when it enacted this enhancement. And I'm drawing this history from the Heinz flag case that I talk about in both briefs. What the Sentencing Commission was worried about were telemarketing schemes, where people would call folks and talk them out of their money. And then when the authorities got wind of it, they would pick up, establish a new call center in a new state or a new jurisdiction, and then make new calls and talk more people out of their money. So there's nothing approaching that that happened here. What would be the analog to that here is if Mr. Wick picked up, went to Mexico, and then solicited more investments, talked more investors out of their money, and said, you guys give me more investments, and I will give you money from oil proceeds. And that just didn't happen. It's also useful, I think, to compare this to the facts of the Heinz flag case that I talked about. Isn't there a case law that says that you don't have to continue with a new fraud or new fraudulent representations when you move in order to get money? I'm not aware of any cases like that. In fact, the government doesn't cite any that I've been able to see. And in fact, every case that I have been able to find that has applied this enhancement has involved the defendant perpetrating new frauds against new people in the new jurisdiction. So you have a scheme where somebody would swindle jewelers out of wristwatches. And they did it in one state, and then they went to another state and committed new swindles. Or somebody who would embezzle money from a corporation that they were hired to be a bookkeeper of, and then they went to a new state, got a job with a new company as a bookkeeper, and took more money. So that is what we're looking at here. This case is more like the Heinz flag case, where it was a stolen identity, an identity theft case, and they stole the identities and created fake identifications and fenced all the goods in Detroit. But then they would go to another jurisdiction and use the fake identities to get goods and then bring them back to Detroit. And the Seventh Circuit said in Heinz flag, well, yes, you went out and did some stuff in support of the scheme in another jurisdiction, but the heart of the enterprise never left Detroit. And similarly here, the heart of the enterprise, which is where the oil is being pumped, where it's being sold, where the money is being diverted to Mr. Wick's bank account, where the omissions occurred, where the corporate books were, everything stayed in Oklahoma. I think it's also noteworthy that the district courts— Can I just add, I mean, you're in charge of your own timing, and of course I defer to my colleagues' interests, but I'm concerned about the restitution and the calculation of loss here. So at some point, if you could manage to reserve or talk a minute or two about that, that would be helpful to me. Yeah, I think that there's also reversal required because the district court erred in applying loss and restitution. You know, what the victims were entitled to was how much better off they would have been if Mr. Wick had done everything he had promised. And what they would have gotten if Mr. Wick had done everything he had promised was the revenue minus the production costs, minus the operating expenses. And what the judge awarded in restitution was just pure revenue without any of the— No, he made an assumption of at least 47 percent cost. He just said with a liberal deduction for production costs, we'd still be over the $550,000 threshold. But the problem is— Did he make that 47 percent assumption on restitution as well or not? No. Restitution, he just ordered pure revenue, which is plainly erroneous. But the other problem is with the loss calculation, there was no basis at all for the court to guess that production costs were 47 percent or less of revenue. And this court has said in Ferdman, which was a restitution case, and most recently in Delgado-Lopez, which was a drug distribution case, that sentencing findings have to be based on evidence. Where did that 47 percent come from? Was there an expert or somebody someplace that at least someplace in the record mentioned a 47 percent? No. And I am just saying 47 percent because I did the calculations. What the judge said is just sort of waved his hand and said, well, even if we make a liberal deduction, we're still over the threshold. So the judge did not use the 47 percent. Right. Right. But what the judge relied on was testimony that it's a very small amount. And he said, when you're looking at the guidelines range, you have to have a pretty big swing to take you down to a lower level. And even if I assumed 47 percent, it's not going to make any difference. Isn't that what happened? That's exactly what happened. And that's crucial because there was no testimony, none that the production costs were a relatively small amount. None. In fact, the only thing we know is that the production costs, we don't know what they were exactly, but we know they were big. And we know that because it includes stuff like paying people to pump the oil, paying people to haul oil and wastewater, paying insurance, electricity, maintenance. And crucially, the only testimony really that we have about production costs is that they sometimes exceeded revenue in its entirety. They were sometimes so high that there was no revenue left over. Then we also have evidence that Mr. Wick, in fact, paid mountains of expenses to keep the oil wells running. So all we have really is, again, just the judge's speculation that these production costs were small. Sorry, you've got one minute left. I want to ask you quickly on your evidentiary objections. Isn't it harmless? Even if we agreed with you, isn't it? I don't think it's harmless at all. First, because the government waived a harmless air defense by inadequately briefing it. But because it's only in a footnote, we don't get away with just raising arguments in a footnote. They shouldn't either. But even if it were preserved, the issue of fraudulent intent was close enough that it could have made a difference. And it's crucial to understand that, again, what was charged here was investment solicitation fraud. And the jury easily could have concluded that Mr. Wick initially solicited these investments with intent to make good on them, but then had a manic episode, went on a bender, spent all the money after the fact, and assumed that there was so much money that it would somehow all work out in the end. Now, that might have been criminal somehow, but it certainly was not the investment solicitation fraud that the government charged. And the jury reasonably could have made that finding. Thank you, Your Honor. Your position is that because they heard some minimal evidence about domestic abuse, that it was significant enough that it impacted their view of whether he was behaving fraudulently. Absolutely. And the reason is that hearing that somebody beats his wife just categorically changes how you think about that person. If you heard that about me, you would never think the same way of me again. You wouldn't need to hear it five and six times or in gory detail. It just categorically and indelibly changes how you think about a person. Thank you. Ms. Berry, we're ready. Thank you, Your Honor. Good morning, Your Honors. My name is Julia Berry, and I will be arguing on behalf of the United States this morning. May it please the court. I'm going to go a bit off script in order to address Mr. Lee's points in order. First, I'd like to address this relocation enhancement because that is what he has spent the most time on. To Judge McHugh's point, this was a factual finding that the district court made that the essence of the scheme was to receive payments from investors and then simply not repay them and spend the money. That's found at the record, Volume 3 at 588. That is a factual finding that this court reviews for clear error. I would also note that there is nothing in the case law, certainly the defense presents no authority and the United States has found none, that supports his assertion that a defendant must repeat or recreate the scheme for the enhancement under 2B1.1B10A to apply. That's simply not what the cases say. Heinz Flagg, which the defense has relied heavily upon in his argument today, is an opposite to this case. In that Seventh Circuit case, this scheme was never relocated because it was always meant to operate in multiple locations with one city as home base. Here, Mr. Wick relocated to Mexico and then continued operating the scheme from there. I would also note that United States v. Morris, which is an Eleventh Circuit case, which Mr. Lee cites in his brief, actually rejected the notion that this enhancement is only aimed at telemarketing. Certainly, that is what led to the enactment of the sentencing guidelines, but it is not the manner in which that enhancement is applied. Should this scheme match the indictment? I mean, here, all the counts in the indictment occurred prior to the move to Mexico. So, the scheme, as it was alleged and charged, is not a scheme that was relocated to Mexico. Your Honor, certainly the indictment, an indictment is always a work of art, so to speak. We choose discrete actions to allege counts, but the scheme overall encompassed far more than the discrete counts in the indictment. In fact, many of the witnesses at trial who were defrauded aren't even mentioned in the indictment. The focus of the indictment is clearly on the solicitation of investments with the intent to deceive. That's true, but I think part of that is the manner in which wire fraud as a statute is played out. We have to have a payment, and the transaction in terms of the initial transaction or the loaning payment, those are the interstate wires that constitute wire fraud. The scheme was far broader than that. The scheme involved the intent to solicit those payments, and then the key point is never repay them. Mr. Wick was planning to go to Mexico. Was that alleged specifically in the complaint, the words scheme included, never repaying? Was that phrase or something comparable alleged? The essence of that phrase was alleged, Your Honor, that he did not ever intend to repay investors, and in fact, he did not ever repay investors. Well, Counselor, before you move on, so are you saying, well, maybe just precisely tell us what part of operating the scheme happened in Mexico? I mean, that's the phrase you used. He was operating the scheme from Mexico. What precisely did he do in Mexico that was part of the scheme, operating the scheme? Certainly, Your Honor. So first, Mr. Wick instructed Ms. McKee, after he left for Mexico, to bring back $10,000 of school and well proceeds every time she returned to Mexico. That's in the record, Volume 3, 280-81. Kurt Green was also asked to bring back school and well proceeds. That's the same volume at 191. Robert Wick explained that the night before Mr. Wick left from Mexico, Mr. Wick told Robert and his mother, June Yajola, that he was, quote, going to run everything from Mexico. That's same volume, Volume 3 at 241. And importantly, Ed Willis received an email from Mr. Wick on October 16, 2014, after Mr. Wick was already well established in Mexico, that assured Mr. Willis that Mr. Wick had the money to pay him. In fact, Mr. Willis testified that, quote, he was leading up to getting more money with that little note, meaning that the email was an attempt to get Mr. Willis to continue investing. That's in the record at Volume 3, 163 and 168. Was that email sent from Mexico? Yes, Your Honor. The second part of the enhancement is that the relocation is, I think, to evade law enforcement or regulatory officials. Right, that's part of the test. And here, I think the argument by Mr. Wick is that he was avoiding outstanding DUI warrants and not, in fact, at that time, the investigation of this fraudulent scheme hadn't even begun by the government. Do you have a response to that? I do, Your Honor. First, in the sentencing transcript, the district court found that the purpose of relocating the scheme was not to avoid DUI charges, but, quote, buying some time to perpetuate the scheme. That's a factual finding that this court must review for clear error, and that's in the record in Volume 3 at page 588. I would also note that the trial evidence supported this fact. Mr. Wick explained to his brother, Robert, the night before leaving, this was in August of 2014, months before the assignments were filed, that he was leaving for Mexico and everything was going to be fine. That's in the record at Volume 3 at 241. Also, Ms. McKee explained how they packed up all of their belongings, their trucks, their motorcycle, their campers, their WaveRunner, bundled cash in aluminum foil so that they, which in context was clearly law enforcement, wouldn't know how much money Wick was taking into Mexico. If bundling cash in aluminum foil isn't evading law enforcement, I frankly don't know what is, and that's in the record, Volume 3 at 275. But it seems to me that particular event might be trying to evade not enforcement because of the fraud, but because of regulations about how much currency you can get out of the country and move into Mexico. It's entirely possible that was part of the calculation, but, of course, if one were caught for bulk cash bundling, they wouldn't be able to run their scheme to defraud either. I think that's an important point. There are no other questions on this point. I would like to address the loss in restitution because I believe there's a bit of confusion based upon the reply brief. So, first, I'd like to start by rebutting what is included on page 19 of Defense Counsel's reply brief that makes much of that $590,000 that was paid to investors. To clarify, that $590,000 included startup costs and production costs, and it was a bulk amount for all three wells, including the dry hole, which never produced oil and for which investors were never repaid. In addition, that amount extends from January 2014 through April 2015, six months after we awarded victims restitution. Let me interrupt. So, you're saying that the $590,000 payment was calculated including the cost of production on all three wells? Yes, Your Honor. It's an aggregate. It's all three wells, and it also includes startup costs. So, it's both startup costs and production costs. Tim Matthews. But if an investor was in one well but not the others, are you saying that that investor is being awarded restitution for production on wells that that investor never invested in? No. I'm saying that, in fact, we tried to be conservative by only awarding based upon the percentage that each investor owned in wells that they actually bought an interest in. And because we only have an aggregate cost for all three wells, there's no way to determine based upon the way that Mr. Wick dumped all of the proceeds into one bank account which costs go with which well. Also, there's no way to decipher which costs are production versus startup. The best evidence we have of that is Tim Matthews' testimony that production costs are limited and that they're stagnant. So, based on our FBI analyst's calculations, her method arrived at repayment that was exactly the same to the cent in most cases that Mr. Wick actually repaid investors. So, it matched what Mr. Wick actually thought investors should be receiving. Well, I don't know that I buy that because he was paying investors in a way that you've alleged was trying to lure them in to make more investments by giving them a windfall, that that necessarily means that we should calculate this guideline level and the restitution amount based on a windfall calculation. So, I'm not persuaded by that argument. That's certainly fair, Your Honor. I would like to point out that we are not using Mr. Wick's calculation method to arrive at a calculation. We simply made our own calculation and it happened to match his. We have no better way because of the lack of accounting that he did to accurately, more accurately assess restitution. We have to arrive at a reasonable estimate based on a preponderance of the evidence. And this is the most reasonable that we could come up with. Well, couldn't you have had an expert? Couldn't you have had an expert who would have opined well by well what the ratio of a revenue to cost would be? No, Your Honor, because as defense counsel asserted at sentencing at which none of this was an issue. It was an issue, I should point out. It was simply an allegation of should they be receiving their investment back? And we were saying no, we're only giving them what their expected return would be. Wells are, the oil and gas industry is volatile and there's no way of knowing what costs are going to be associated with what well. The only thing that we do know is the production costs are limited. They're stagnant and they are only insurance, paying the pumper and repair costs. These were new wells. How can you say that they're minimal and we can assume that for all wells when we have well number three where the revenue was zero? So the production, all you had was the startup and production costs, right? And there's no restitution being awarded to anyone on the basis. They lost their money. So Nancy Kersey who invested in well number three, she lost her entire $150,000 investment. That is a gamble. And they took that gamble and they're not being awarded a windfall for investing in a well that didn't produce. I'm simply saying based upon Mr. Wick's bank records and based upon the PACER, which is the oil transport company records, we have no way to decipher what production costs pertain to which well and to come up with. What the district court found was a negligible amount of production costs and subtract that from the hundred or, excuse me, I'm sorry. Who bears the burden of not being able to calculate it? It is our burden by a preponderance of the evidence to come up with a reasonable estimate, which I believe we did. And I believe the district court agreed with us. So the investor for each of these wells got the same ratio of costs to revenue applied and then given to him or her according to the amount of that investment. Is that right? According to the percentage that they owned in the well that produced, yes. And so you made no differentiation between a well that was a bigger producer versus a well that was less productive. That's true. Well, actually, I shouldn't say that because it's based on. We separated out PACER proceeds by well one and by well two, the two producing wells. So we came up with a percentage based upon the production for each well. We don't know the production costs, though, for those two wells because Mr. Wick was paying costs across wells. We don't know what goes to well three, which didn't produce at all for which investors got nothing. We don't know what goes to well one or well two. I honestly do not know a better way to calculate restitution than the manner in which we did. I would like to touch briefly upon issue one, your honors, and simply note that the district court committed no error, much less a plain one in admitting two words, physical and beating in over 30 pages of testimony, and that this was highly probative of Mr. Wick's intent to defraud investors and rebutting the theory that he intended to repay them all along with it. Ms. McKee simply spent the proceeds before he was able to. And I would simply note that prejudice has to substantially outweigh the probative value for it to be excluded. And I believe that the district court made. So your argument is that there was no error because you really inadequately briefed a proposition of harmless error. You just mentioned it in a footnote. So you either win or lose on whether we agree or disagree, whether this was error. Is that is that what you're saying? I'm saying there was. I would I would say, your honor, first of all, I do believe we adequately briefed it. I don't think we need to even get to a harmless error level. I think this is reviewed for plain error. And I think it also survives an abuse of discretion review, even if the court disagrees with me that the error, the objection was not preserved. I understand. You're agreeing that we look at this and ask, was it error? Plain error? I would include prejudice bias, but you don't assert on the plain error analysis. Even you, you don't put on a case about it not being prejudicial. Your honor, I believe we do state that any conceivable prejudice is minimal because they are simply two words in over 30 pages of testimony. There is very fleeting reference to the abuse. It's extremely minimal, particularly when taken in context of the damning evidence against Mr. Wick that was adduced at trial. Evidence was adduced that he was a drunk, that he defrauded people, that he lied to people. I do not think that two words in over 30 pages of testimony that was highly probative in rebutting the defense's theory that he intended to repay people all along was prejudicial. Thank you. And since we had the government go over, I'm going to give you Mr. Lee, just a minute and 30 seconds for rebuttal. You're muted, Mr. Lee, we can't hear you. But it was a very persuasive argument. Thank you. How about now? We can hear you now. The government says that this spousal abuse testimony was relevant to proving fraudulent intent, but I just don't see how that's possibly so. Again, all of these transactions occurred two months beforehand, before this alleged abuse. And Ms. McKee testified, I came down there, he had sent me to Oklahoma to find out what shape the oil business was in and to bring him money. And I came back and he said, well, how are the oil wells doing? How are they going? And she doesn't want to tell him that there's no money because she thinks he's going to be mad when there's no money. She tells him and allegedly then he beats her. And I just do not understand how him beating her when he learns there's no money is relevant to the question of whether two months earlier he acted with fraudulent intent. Then on the whether it was more prejudicial than probative. I've cited a number of cases that say when the probative value is minimal, even a modest possibility of prejudice is enough. And at best, the probative value is minimal. We're all scratching our heads to figure out how this had anything to do with anything. And for the jury to hear that he is a wife abuser made them more likely to convict him on grounds that had nothing to do with whether he committed fraud. Thank you, your honors. And I'd ask you to reverse. Thank you. We will take this matter under advisement and issue a decision as soon as we can. And we will move on to the next case.